## CROFT *v.* SORRELL *et al.*

1. Inadequacy of price at a public sale under power will not of itself be a sufficient ground to set aside a sale; yet when it is *grossly inadequate* and is connected with fraud, mistake, misapprehension, surprise, or other circumstances which tend to bring about such inadequacy, to the injury of parties interested, the sale will be set aside by a court of equity.
2. But under the facts of this case the jury were not authorized to find a verdict in favor of the plaintiff, on the ground of surprise or other circumstances which tended to bring about gross inadequacy in the price bid at the sale by the purchaser, to the injury of the complainant.
3. The court erred in refusing a new trial.

No. 2040. FEBRUARY 16, 1921.

Equitable petition. Before Judge Thomas. Colquitt superior court. April 8, 1920.

*James Humphreys* and *Dowling & Askew,* for plaintiff in error.
*P. Q. Bryan* and *Hill & Gibson,* contra.

HILL, J. J. T. Sorrell individually and as administrator of the estate of J. J. Sorrell, deceased, brought an equitable petition against L. C. Croft, British American Mortgage Company Limited, and Robert L. Shipp, to enjoin the two defendants last named from executing and delivering, and Croft from receiving, a deed conveying to him 260 acres of land, more or less, on the grounds, that the land sold had been improperly advertised, and that the sale of it as the property of the mortgagor, J. J. Sorrell, who at the time of the sale was dead, was illegal. Subsequently the plaintiff amended his petition, alleging that the inadequacy of the price at which the land was bid off, combined with the circumstances attending the sale, amounted to fraud. A general demurrer to the petition was overruled, and also special demurrers; but it appears that the special demurrers were filed after the first term of the court, which was too late. The court did not err in overruling the demurrer. At the trial the judge by his ruling eliminated the question of irregularity in the advertisement of the land under the power of sale contained in the mortgage, and the contention that it could not be sold as the property of the mortgagor after his death. The plaintiff acquiesced in this by failing to except thereto; and the case went to trial solely on the question of whether the land was sold for a grossly inadequate price and whether in the sale there was fraud, accident, or mistake, etc.

In the view we take of this case the evidence was not sufficient to authorize the verdict, and the court erred in refusing a new trial. The evidence for the plaintiff showed that the sale had been going on for half an hour, and that it "was a slow sale." R. L. Shipp and Croft, the defendant, had been bidding against each other. Shipp primarily was bidding as attorney for the British American Mortgage Company Limited, in order to make the land bring the amount that was due his client, which was about one thousand dollars. Croft was bidding for himself. After Shipp had made the property bring the amount of his client's debt, he continued to bid for Mrs. J. J. Sorrell and her son, who were the widow and son respectively of J. J. Sorrell, deceased, the mortgagor. Shipp and Croft had raised each other's bids until the bid was in the neighborhood of $1800, the limit that Shipp was authorized to bid for Mrs. Sorrell and her son. When Shipp made his last bid he turned in the direction of J. T. Sorrell, L. L. Moore, and W. W. Stokes, threw up his hands, and repeated twice: "I am through." The three were standing within ten or fifteen feet of Shipp and of the sheriff, Boyd, who was "crying the property." After Shipp announced that he was through bidding, Croft bid the sum of $1800; and at least one witness for the plaintiff testified that the sheriff then cried, "One, two, three," and knocked the property off to Croft. J. T. Sorrell testified: "I was aiming to bid on it, but it was knocked off before I knew it. Mr. L. L. Moore, Mr. W. S. Stokes, and myself were talking. Mr. W. W. Boyd [the sheriff] cried the property, standing up on the porch out there where he usually stands. We were standing about as far away as from here to Mr. Gibson [the attorney examining him], I suppose, when it was knocked off. We were standing out there on the ground. I discovered that the property was knocked off when he was reading an advertisement on another piece of property. I did not do anything, but Mr. Moore started to notify Mr. Boyd. . . I would not say how long he cried it off; the sheriff can answer that for himself. He did not cry it off in the usual tone; he was talking very low towards the last. I did not have a talk with the sheriff after the sale, nor with Mr. Less Croft myself. I could not tell how many other mortgages outstanding against the property in addition to the executions which I had as administrator purchased. I have not run any citation on it. I bought one fi. fa. other than any of them, that ought to have been put ahead of them."

L. L. Moore, sworn for the plaintiff, testified: " I was there for the purpose of bidding for Mr. J. T. Sorrell. Mr. W. W. Boyd, sheriff, cried off the property for sale. Mr. Boyd was selling it for the British American Mortgage Company Limited, and not as an execution sale, and was designated to act as auctioneer. I do not recall how long it was when it was first offered for sale until it was knocked off, but was an ordinary short sale. I do not think we put in a bid, but there was bidding going on — Mr. Croft and Mr. Shipp; and for the purpose of consulting we stepped aside just to the left of the east door of the court-house, about twelve or fifteen feet from Mr. Boyd, the auctioneer; and when we left his presence he was crying bids as the sheriff usually does, with no prospects, and I thought of coming on, and the business was going along, and we had not been gone over the total of half a minute before I discovered the silence around there, and I rushed up to see what had happened, and I was informed that it had been knocked off to Mr. Croft for $1800. The sheriff informed me, and I offered him $1850 for it and insisted that he accept it. We were ready to pay it at that time, and we were making another bid. I asked him to reoffer the property, but he said that it had been knocked off; and I said reopen it, and he said that he could not do it, or refused to do it. I do not remember his exact words. I grant you the sheriff was in good faith then, and could not reopen. . . We got away for the purpose of discussing the bids a little further, and the sheriff was crying off at that time, and I had an ear open to hear it; and when the silence come, I went back to see what had transpired. . . Certainly I knew that a land sale was going on there. I was trying to get his limit when they were talking to me. I heard the sheriff calling for bids when I left, but I did not hear him say he would knock it off to anybody. I do not think he counted a single thing; if he did, he did it in a low tone, as I was trying to keep up with him and I failed to hear it. I believe Mr. Croft was not over six or eight feet from the sheriff. When I discovered that the property was knocked off, I went to the sheriff and conveyed to him that I wanted to bid, I think . . I heard Less Croft make bids on the property. I do not know whether Mr. J. E. Sorrell bid on the property. My idea was to get the property bid off into the Sorrell family, and I was there to buy it, and I tried to discourage Mr. Croft from bidding. I told him that I did not know whether it

was good or not. I knew the point was raised here as to the administration, but did not have that in mind then, as there was a conflict in the land lines. I thought he would have trouble on that. I knew that there were other lawsuits against the place, as there were some other liens against it."

W. S. Stokes testified for the plaintiff: "I was sorter a third party in the conversation between Mr. Sorrell, Mr. Moore, and. myself. Mr. Moore and Mr. Sorrell were more in the conversation than myself. I would say that I was about twelve to fifteen feet from the auctioneer when the property was knocked off. . . Mr. Shipp stopped bidding and said that he was done, and the sheriff having received a bid from Mr. Croft for more, making the bid for $1800, and the property was knocked off, and I remarked about the abruptness with which it had ended, and I think I called Mr. Sorrell and Mr. Moore's attention to the fact. Mr. Moore immediately got busy with a request to reopen. . . I heard Mr. Shipp bid. The reason I did not bid then was because Mr. Shipp said he was done, and I was not accustomed to seeing it done without hollering out a few times. We had been there for about half an hour. I do not think that much hollering had been done. Yes, they had been doing that for some little time; it was a slow sale, the bids were small with Mr. Shipp and Mr. Croft, and there was not anybody else bidding toward the last. I was not engaged in the conversation so much, I was not watching the progress of the sale, but I kept up with the bids. The sheriff cried, 'One, two, three,' mighty close on to one another, but I do know whether he went over it so deliberately." Robert L. Shipp testified for the plaintiff, that he had charge of the sale of the land in behalf of the British American Mortgage Company, which he was representing in the transaction. Sheriff Boyd and Shipp were good friends, and the sheriff for accommodation "cried the sale." "I was present at the sale, and represented the loan company. Mr. Boyd was acting for accommodation, and got no pay for it. J. J. Sorrell was dead at the date of the sale. I do not know how long he had been dead, except that he died before the advertisement started. Mr. Sorrell and I had been friends for years; and his boy asked me to sell this property this way, and it is contrary to the rule of the British American Mortgage Company. There were only two heirs, J. E. and the widow. Yes, I bid at the sale. . . I was

bidding for them, and I do not suppose they knew. I suppose both of them knew I was trying to save the property for them. My company only had about a thousand dollars in it, and there was no question about us getting our money, and whatever I could do there I would do it for them. No I had no personal interest in the case. . . I do not remember Mr. Stokes, but Mr. Moore and Mr. Sorrell were on the ground opposite the other abutment. I know that he was about the sale. I know that Mr. Croft heard Mr. Moore offer to raise the bid. . . Mr. Moore and Mr. Sorrell were close enough to hear me when I said, 'I am through.' When I got through bidding I turned around to Mr. Sorrell and Mr. Moore and said I was through, twice; that my bidding was up. I was as close to them as from here to you when I said, 'I am through.'"

We have quoted above entirely from the evidence for the plaintiff. The evidence for the defendant is even stronger against the contention of the plaintiff. The general rule is that inadequacy in price at a sheriff's sale will not of itself be a sufficient ground to set aside a sale. "Yet when it is grossly inadequate and is connected with fraud, mistake, misapprehension, surprise, or other circumstances which tend to bring about such inadequacy, to the injury of parties interested, the sale will be set aside by a court of equity." *Smith* v. *Georgia Loan & Trust Co., 114 Ga.* 189 (39 S. E. 846). We see no reason for a different rule as to a public sale under a power. Applying this rule to the facts of the present case, the strongest in the plaintiff's favor being set out above, we do not think that the facts show such a case of legal "surprise," or otherwise, as to bring it within the rule stated above. In order for the plaintiff to prevail he must show that the circumstances complained of produced gross inadequacy of price, and that he himself was free from fault. From the facts testified to by his own witnesses he was not free from fault at the time of the sale. He had withdrawn himself apart from the place of the sale, and was engaged in conversation with others when the property was knocked off to the purchaser. In addition to that, at least one of complainant's friends endeavored to make this property bring as little as possible in order, according to his evidence, that the Sorrell family might purchase it; and even if the property actually brought less than its real value, under the circumstances the plaintiff will

not be heard to complain. There is evidence tending to show that he and his friends were endeavoring to chill the sale, according to the evidence of one of his witnesses, speaking of liens against the land, and that there was a dispute as to the land lines, thus endeavoring to keep down competitive bidding at the sale. In addition to this, the evidence shows that after the land was knocked off to Croft at $1800, Moore, for complainant, offered to raise the bid only $50, which presumably he thought was a fair price. This is a case in equity, and the plaintiff must come into court with clean hands before he can recover.

The other grounds of the motion for new trial do not require a reversal.                    *Judgment reversed. All the Justices concur.*